12

FILED

JUL 19 2007

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No.  03-11610-B-7 |
| Central Valley Processing, Inc., | |
| Debtor. | |
| Michael D. McGranahan, Chapter 7 Trustee, | Adversary Proceeding No. 05-1072 |
| Plaintiff, | |
| v. | |
| Harris Woolf California Almonds, a General Partnership, | |
| Defendant. | |

**MEMORANDUM DECISION AFTER TRIAL ON COMPLAINT TO AVOID AND RECOVER PREFERENTIAL TRANSFER AND DISALLOW CLAIM**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

T. Scott Belden, Esq., and Lisa Holder, Esq., of Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, LLP, appeared on behalf of Michael D. McGranahan, chapter 7 trustee (the "Trustee").

Albert J. Berryman, Esq., of Baker, Manock & Jensen, appeared on behalf of Harris Woolf California Almonds, a General Partnership.

A trial was held before the court on the Trustee's Complaint to Avoid and Recover Transfer and Disallow Claim. During the ninety days prior to filing bankruptcy (the "Preference Period"), Central Valley Processing (the "Debtor") made a payment to Harris Woolf California Almonds ("Harris Woolf") in the amount of $246,400 (the "Payment").

65

1   The Trustee alleges that the Payment is avoidable as a preferential transfer under 11
2   U.S.C. § 547(b).[1]  Harris Woolf contends that the Payment was made in the "ordinary
3   course of business" and thus excepted from the Trustee's power to avoid preferential
4   transfers under § 547(c)(2).  The complaint also seeks to disallow Harris Woolf's proof of
5   claim under § 502(d).  However, the record does not show that Harris Woolf has filed a
6   proof of claim in this bankruptcy case.  For the reasons set forth below, judgment shall be
7   entered in favor of Harris Woolf.
8       This Memorandum Decision contains the court's findings of fact and conclusions
9   of law as required by Federal Rule of Civil Procedure 52(a), made applicable to this
10  contested matter by Federal Rule of Bankruptcy Procedure 7052. The bankruptcy court
11  has jurisdiction over this matter under 28 U.S.C. § 1334 and 11 U.S.C. §§ 547 and 550
12  and General Orders 182 and 330 of the U.S. District Court for the Eastern District of
13  California.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (F).
14  **Background and Findings of Fact.**
15      The Debtor was a corporation in the business of buying, processing, and reselling
16  almonds.  The Debtor filed a petition under chapter 11 in February 2003.  The case was
17  converted to chapter 7 in November 2003.  For about 12 months prior to filing bankruptcy
18  the Debtor had purchased almonds from Harris Woolf, which is in the business of
19  processing and selling both almonds that it grows and those of other growers.
20      The parties stipulated to the following facts surrounding a series of transactions
21  between Harris Woolf and the Debtor from October 19, 2001, to September 6, 2002.
22  During that time, Harris Woolf made 17 shipments of almonds to the Debtor, with a value
23  of $847,327.  The almonds were sold pursuant to seven sales contracts.  Each shipment
24
25
26  [1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy
    Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-
27  9036, as enacted and promulgated *prior* to October 17, 2005, the effective date of The
    Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20,
28  2005, 119 Stat. 23 ("BAPCPA").

2

1  was separately billed to the Debtor with invoices dated the same date as the shipment.
2  Each invoice stated that payment was due 30 days from the date of the invoice.  The
3  Debtor did not pay any of Harris Woolf's invoices within 30 days.

4      On March 22, 2002, Harris Woolf and the Debtor entered into their final contract,
5  number 50202, for the purchase of almonds worth $492,800.  Harris Woolf made eight
6  shipments of almonds to the Debtor pursuant to contract number 50202, beginning on
7  August 28, 2002.  This litigation involves the last four shipments which were made and
8  invoiced between September 6 and September 27, 2002, and which were paid for within
9  the Preference Period.

10     Those last four invoices, each in the amount of $61,600 and aged from 67 to 88
11 days after shipment, were paid by the Debtor with the Payment, a single check for
12 $246,400.  The Payment was received by Harris Woolf and deposited into its bank
13 account on or about December 3, 2002.  The Payment was made with property of the
14 Debtor and made while the Debtor was insolvent.  The allowable unsecured claims
15 against the Debtor's bankruptcy estate exceed the available assets; ergo, Harris Woolf
16 received more through the Payment that it would have received for its last four invoices
17 through a chapter 7.  The Payment was made for a debt, contract number 50202, incurred
18 in the ordinary course of business between the Debtor and Harris Woolf.

19     The form of the Payment tendered (company check as opposed to wire transfer or
20 cashier's check) and the manner in which the Payment was made (first-class mail as
21 opposed to wire transfer or personal delivery) were the same as had been used in all prior
22 transactions between Harris Woolf and the Debtor.  The Debtor's payments to Harris
23 Woolf were always made past their stated 30-day due date.  Yet, Harris Woolf continued
24 to deliver almonds to the Debtor regardless of whether outstanding invoices remained
25 unpaid.[2]  Harris Woolf's office manager frequently had to call the Debtor to request

26

27

28
_____

[2]Between October 19, 2001 and January 15, 2002, Harris Woolf delivered five shipments
of almonds to the Debtor before it received payment for the first shipment.  The first payment

3

1  payment of past-due invoices.  However, Harris Woolf did not threaten the Debtor with

2  litigation, nor did it threaten to withhold further deliveries of products to the Debtor

3  unless it was paid for any past due invoices.

4  **Standard of Proof.**

5       The parties have stipulated to all of the facts necessary to support the Trustee's

6  *prima facie* case, that the Payment is subject to avoidance under § 547(b).  Harris Woolf

7  bears the burden of proving, by a preponderance of evidence, that the Payment is not

8  avoidable pursuant to the "ordinary course of business" exception of § 547(c)(2).  *See*

9  *Arrow Elec. Inc. v. Justus (In re Kaypro)*, 230 B.R. 400, 404 (9th Cir. BAP 1999)

10  (citations omitted).

11  **Issue.**

12       There is no dispute that the Payment was "late" in relationship to the 30-day term

13  stated in each of the Harris Woolf invoices.  The sole issue is whether the Payment was

14  too late to qualify for "ordinary course" treatment.  The Trustee asks the court to impose a

15  "bright line" test and find that any payment made beyond a fixed time period must fall

16  outside of the ordinary course exception.

17  **Analysis and Conclusions of Law.**

18       Section 547 is an example of the balance which the Bankruptcy Code strikes

19  between the interests of debtors and creditors and the public's interest in a vital economic

20  climate.  Section 547(b), coupled with § 550, allows the bankruptcy trustee to avoid and

21  recover as "preferential transfers" some payments made to creditors within 90 days prior

22  to commencement of the bankruptcy case.  A creditor which received these funds must

23  turn them over to the trustee who will use them to pay administrative expenses, priority

24  claims, and unsecured claims.  The purposes of this provision include discouraging

25  creditors from snapping at the heels of troubled businesses and perhaps precipitating their

26  

27  was made 96 days after the first shipment.  On April 23 and April 29, 2002, Harris Woolf
   shipped almonds to the Debtor despite the fact that it had not been paid for an invoice which had

28  been technically "past due" since April 5, 2002.

4

"slide into bankruptcy" and to ensure the distribution of the assets according to priority should a petition in bankruptcy be filed. 5 *Collier on Bankruptcy* (15th Ed. Rev.), ¶ 547-9 (2006).

The trustee's avoiding powers under § 547(b) are balanced by § 547(c) which carves out eight exceptions. These exceptions are designed to promote the public interest by not punishing creditors which continue to provide vital support to businesses in dire financial straits. All creditors have an interest in the continued viability of the debtor. *Id.*

The only exception relevant to this case is the "ordinary course of business" exception under § 547(c)(2).[3] As the court in the Ninth Circuit explained in *Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*, 315 F.3d 1192, 1197 (9th Cir. 2003), "[t]he [ordinary course] exception deter[s] the race to the courthouse and enabl[es] the struggling debtor to continue operating its business." The "ordinary course of business" defense should be construed broadly because it "furthers the policy of preventing 'dismember[ment]' of the debtor during his slide into bankruptcy,' by enabling . . . 'the struggling debtor to continue operating its business.'" *Schoenmann v. BCCI Construction Co. (In re NorthPoint Communications Group, Inc.)*, 361 B.R. 149, 156 (Bankr. N.D. Cal. 2007), citing *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d. 514 (1991).

This defense involves a two-part subjective and objective inquiry. To qualify for

---

[3]Prior to amendment under BAPCPA, (see footnote 4, infra), § 547(c) provided in pertinent part:

> (c) The trustee may not avoid under this section a transfer–
>    . . .
>    (2) to the extent that such transfer was–
>       (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>       (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
>    (C) made according to ordinary business terms.

1   "ordinary course of business" protection, a creditor must show: (1) both the debt and its

2   payment were "ordinary" in relation to past practices between the debtor and the creditor

3   (§ 547(c)(2)(A) & (B), the "Subjective Test"); and (2) the payment was "ordinary" in

4   relation to prevailing business standards (§ 547(c)(2)(C), the "Objective Test"). *Sulmeyer*

5   *v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir. 1994) quoting *Mordy*

6   *v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d 396, 398 (9th Cir. 1992).

7        Here, the Trustee stipulated that the underlying debt was incurred by the Debtor in

8   the "ordinary course of business." § 547(c)(2)(A). Now this court must decide whether

9   the Payment satisfies the other two elements of § 527(c)(2); whether the Payment was

10   made in the ordinary course of business between the Debtor and Harris Woolf <u>and</u> made

11   according to ordinary business terms.[4] These two tests are best examined in reverse

12   order.

13       **A.**     **The Objective Test Under Section 547(c)(2)(C).**

14        The first inquiry is whether the timing of the Payment was "ordinary" within the

15   almond industry. The Trustee offered into evidence (Plaintiff's exhibit 5) a roughly

16   drawn "bell curve" prepared in the course of discovery by Harris Woolf's expert witness,

17   Ned Ryan, to illustrate the timing of payments typically made by almond processors. That

18   drawing tends to show that payments are made over a range beginning less than 30 days

19   and extending more than 90 days.[5] Mr. Ryan testified that 30-day payment would tend to

20

21        [4]The Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA") amended

22   § 547(c)(2) to replace the conjunction "and" with "or" thus making the second and third parts of
the "ordinary course of business" inquiry disjunctive. In bankruptcy cases filed *on or after*

23   October 17, 2005, the defense can be established by a showing that the disputed transfer of
property was consistent with either the Subjective or the Objective test. The legislature thus

24   chose to increase the protection of payments to creditors who provide goods and services to

25   financially distressed debtors.

26        [5]Plaintiff's exhibit 5 is ambiguous in that it is not clear whether the "bell curve" reflects

27   days after the shipment of almonds or "late" days after the due date stated on the invoice. That
distinction, however, is not material to the court's ruling. For purposes of the court's analysis,

28   the court will presume that the exhibit measures days after the shipment.

6

1    be the minimum payment time practiced within the almond industry.  He also testified

2    that most payments, more than 50%, were made between 30 and 50 days, but that a 90-

3    day payment would not be unusual.   Based on exhibit 5, the Trustee asks this court to

4    define a "bright line" between what is, and is not, "ordinary."  The Ninth Circuit,

5    however, has expressly rejected the "bright line" standard in considering the Objective

6    Test.

7          In the 2003 case, *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, the chapter 7 trustee

8    attempted to recover a payment made by the debtor to one of its creditors, a recreational

9    vehicle dealer, during the preference period.  The creditor raised the "ordinary course of

10   business" defense.  The court cited *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033

11   (7th Cir. 1993), in connection with the Objective Test and concluded that "ordinary

12   business terms" refers to the broad range of terms practiced in the industry and that only

13   extraordinary dealings so "idiosyncratic as to fall outside" that range are outside the scope

14   of subsection 547(c)(2)(C).

15         The court rejected the trustee's request for a "bright line" test stating:  "Only a

16   transaction that is so unusual or uncommon as to render it an aberration in the relevant

17   industry falls outside the broad range of terms encompassed by the meaning of ordinary

18   business terms." *Jan Weilert RV, Inc.*, 315 F.3d at 1198 (internal quotation marks

19   omitted).  In this statement, the court in *Jan Weilert RV, Inc.*, implicitly recognized that

20   there is a point at which certain business conduct takes a transaction, or even a series of

21   transactions, outside the wide range of "ordinary business terms" within that industry, but

22   held  that "ordinary business terms" cannot be reduced to a "bright line" test.  *Id.* at 1199.

23   Instead, the bankruptcy court must define the "ordinary business terms" by looking at the

24   broad range of business terms used within an industry with the goal of protecting ordinary

25   trade credit transactions within the industry.  *Id.* at 1198.

26          The Payment at issue in this case was made in satisfaction of four invoices aged

27   from 67 to 88 days after shipment to the Debtor.  The only relevant evidence in the record

28   suggests that payments are typically made in the almond industry between 30 and 90 days

7

1   after shipment.  The facts that Harris Woolf continued to ship almonds to the Debtor even

2   after the due date on prior unpaid invoices, and did not have to resort to unusual

3   collection tactics to get its invoices paid, further support a finding that late payments are

4   generally recognized and accepted within the industry.  The court is persuaded that the

5   Payment was made within the range of "ordinary business terms" in the almond industry.

6   § 547(c)(2)(C).

7       **B.**    **The Subjective Test Under Section 547(c)(2)(B).**

8       The second inquiry is whether the timing of the Payment was "ordinary" within the

9   course of business dealings between the Debtor and Harris Woolf.  Harris Woolf only did

10   business with the Debtor for about one year prior to the bankruptcy and only sent 17

11   shipments to the Debtor during that time.  The payment history for those transactions

12   shows that all payments made by the Debtor to Harris Woolf were made between 38 and

13   96 days after shipment.  The Trustee argues, based on that evidence, that the Payment for

14   invoices aged 67 to 88 days was "too late" to be subjectively "ordinary."  Again, the

15   Trustee asks the court to impose a "bright line" test as to how many days are and are not

16   "ordinary" within the meaning of § 547(c)(2)(B).

17       The 1994 case, *In re Grand Chevrolet, Inc.*, 25 F.3d 728, illustrates that the

18   Subjective Test cannot be reduced to a "bright line."  The chapter 11 trustee sought to

19   avoid as "preferential transfers" three payments made from the debtor-seller of used cars

20   to the automobile dealer.  The trustee argued that the payments at issue were not ordinary

21   under either the Subjective Test or the Objective Test.  The court prescribed four

22   nonexclusive  factors to consider in the Subjective Test:

23        1)    the length of time the parties were engaged in the transactions at issue;

24        2)    whether the amount or form of tender differed from past practices;

25        3)    whether the debtor or creditor engaged in any unusual collection or payment
26              activity; and

27        4)    whether the creditor took advantage of the debtor's deteriorating financial
              condition.

28   *Id.* at 732.

1    The court held that, although delay in payment is particularly relevant, "late
2    payments can fall within the ordinary course of business exception if the prior course of
3    conduct between the parties demonstrates that those types of payments were ordinarily
4    made late." *Id.*

5    With reference to the four factors described in *Grand Chevrolet, Inc.*, the parties
6    here have stipulated to the second and third factors: The amount and form of tender of
7    the Payment was "ordinary" in relation to past practices, and Harris Woolf did not engage
8    in any unusual collection or payment activity. With regard to the first and fourth factors,
9    the evidence shows that the parties had a business relationship comprised of 17 separate
10   transactions over a period of about one year. Oral testimony presented at trial supports a
11   finding that Harris Woolf was unaware that the Debtor was suffering from financial
12   difficulties. The court is persuaded that Harris Woolf did not seek to take advantage of
13   the Debtor in the transaction at issue. Accordingly, the four *Grand Chevrolet* factors all
14   appear to weigh in favor of Harris Woolf.

15   The recent Ninth Circuit case, *In re Ahaza Systems, Inc.*, 482 F.3d 1118 (9th Cir.
16   2007), further supports the conclusion that a "bright line" test is not appropriate here.
17   The chapter 7 trustee argued that the Subjective Test could not be met, as a matter of law,
18   where the debtor and creditor had only one transaction before bankruptcy. Concluding
19   that the Subjective Test is a question of fact, the court of appeals reversed the bankruptcy
20   court's granting of summary judgment for the creditor and remanded for trial with regard
21   to the Subjective Test. The court noted the fact-specific nature of the Subjective Test
22   inquiry and "the lack of a precise formula concerning how the four *Grand Chevrolet*
23   factors - or other factors - should be combined." *Id.* at 1129. The decision *In re Ahaza*
24   *Systems., Inc.,* lends no support for the proposition that the Subjective Test can or should
25   be reduced to a "bright line" as the Trustee suggests the court should do here.

26   In a recent bankruptcy court case, *In re NorthPoint Communications Group, Inc.*,
27   361 B.R. 149, the court addressed the issue of whether a defendant can satisfy the
28   Subjective Test where the payments at issue depart significantly from past practices. The

9

chapter 11 debtor contractually agreed to pay the defendant's invoices for construction work within 30 days, but in practice made the payments from 19 to 135 days after invoice with checks drawn on an operating account. The payments during the 90-day preference period were paid within 95 days, except one which was made 286 days after invoice.[6] One payment was made by wire transfer and one payment by a check drawn on a payroll account. Follow up statements regarding past due amounts were never sent by the creditor. However, *NorthPoint* finally made an inquiry of the amounts due. The creditor responded with a letter requesting payment on past due amounts and threatening to file mechanic's liens if payment was not made.

The court found the four "*Grand Chevrolet*" factors to be insufficient guidance because in *Grand Chevrolet,* the court "stated expressly that its list of relevant factors is not exclusive" and failed to indicate what other factors might be relevant. *NorthPoint Communications Group, Inc.*, 361 B.R. at 157. The court observed that the subject payments, for tenant improvements to leased property, were made in furtherance of the debtor's business plan to assume the subject leases and assign them to a potential buyer of the debtor's assets. The court further noted that the creditor's collection letter did not threaten work stoppage or legal action and it was only sent after NorthPoint had requested a summary of amounts due.

The court decided other factors which should be considered include those which shed light on whether the payment made as a result of unusual creditor pressure, or the debtor's desire to actually prefer the creditor to other creditors. Where there is no evidence that the payment resulted from the proscribed practices, the payment should be considered "ordinary" unless the objective characteristics are so different from prior dealings that they represent an aberration in the course of dealing with these parties. *Id*.

---

[6]The court did find without specific analysis, that the single payment of $607 made 286 days after invoice was not made according to ordinary business terms and was recoverable by the trustee. *In re NorthPoint Communications Group, Inc.*, 361 B.R. 158 at n.9. It did not make that finding based on a "bright line" test.

10

at 158. With one minor exception, the court found that the payments were made in the "ordinary course of business" between the debtor and the defendant creditor. *Id.* at 159.

Returning now to the case at hand, the raw numbers can be examined many different ways to show how each dollar paid to Harris Woolf compares to every other dollar. The historical timing of each payment to Harris Woolf may be organized, averaged, and medians determined and the "weighted" amount of each payment can even be added to the analysis. However, timing alone cannot take the Payment out of the "ordinary course" of business unless this court is willing to draw some "bright line" for the Subjective Test based on that analysis; the same "bright line" which the court expressly rejected for the Objective Test in *In re Jan Weiler RV, Inc.* A determination of whether the Payment was made within or without the "ordinary course of business" exception is a question of fact which cannot be decided by isolating the timing of the Payment from other factors as delineated in *In re Grand Chevrolet, Inc.*, and developed in *In re NorthPoint Communications Group, Inc.*

Here, the Debtor's Payment, for invoices aged 67 to 88 days after shipment, was consistent with the course of business dealings between the parties during the 12 months prior to the bankruptcy. During that time, the Debtor made payments to Harris Woolf from 38 to 96 days after shipment and invoicing. Where the transaction history between Debtor and Harris Woolf shows that late payments were the norm, and without further indicia of extraordinariness, the court is persuaded that the Payment was not distinguishable from the "ordinary course of business" between the parties.

**<u>Conclusion.</u>**

The Trustee has not cited any authority for the proposition that the "ordinary course of business" defense, or any of its components, can or should be reduced to a "bright line" test. The Trustee offers no evidence as to where that "bright line" should be drawn, or why. Prior to the enactment of BAPCPA, the courts have consistently interpreted the "ordinary course of business" defense broadly, to protect and encourage creditors who continue to do business with a struggling debtor. Under BAPCPA,

Congress too confirmed its intent that the "ordinary course of business" defense be interpreted broadly. This court, therefore, declines the Trustee's invitation to restrict the defense by imposing a "bright line" test to define what was and was not "ordinary" in the way that Harris Woolf and the Debtor conducted their business affairs. Considering the history of transactions between the parties, it is clear that the Payment was not an "aberration" either subjectively or objectively. The court finds and concludes that the Payment was made in the ordinary course of business. Accordingly, judgment will be entered for the Defendant, Harris Woolf.

Dated: July _14_, 2007

W. Richard Lee
United States Bankruptcy Judge

12